**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| WAG ACQUISITION, L.L.C., | § | |
| *Plaintiff*, | § | |
| v. | § | Case No. 2:24-cv-00714-JRG |
| | § | |
| TECHNIUS LTD. d/b/a stripchat.com, | § | |
| *Defendant*. | § | |

# CLAIM CONSTRUCTION ORDER

WAG Acquisition, LLC alleges infringement by Technius Ltd. of claims from three related patents about "systems and methods for delivering streaming media, such as audio and video, on the Internet." U.S. Patent 8,185,611 at 1:31–33. *See also* U.S. Patent 10,567,453 at 1:50–52 (same); U.S. Patent 8,364,839 at 1:35–37 (same).[1] Whereas prior-art systems deliver a media stream to a player at the rate the stream will be played, the patents teach sending the data to the media player faster than the playout rate so the buffer holds more data and thus has more tolerance for interruptions in the connection. *See* '611 Patent at [57] (describing the invention generally as sending data to a computer "more rapidly than it is played out by the user system. The audio/video data in the user buffer accumulates; and interruptions in playback as well as temporary modem delays are avoided.").

The parties present 12 terms for construction, although many of the underlying issues overlap between those terms. Having considered the parties' briefing, along with arguments of counsel at a March 4, 2026 hearing, the Court resolves the parties' disputes as follows.

[1] *See* '453 Patent at [63] (noting the underlying application is a "Continuation of application No. 13/385,375, . . . , now Pat. No. 8,364,839, which is a continuation of application No. 12/800,177, . . . , now Pat. No. 8,185,611").

## I. BACKGROUND

The patents relate to streaming audio and video. With prior-art methods, a source delivers a media stream to a media player at the rate it is to be played. For example, if a user is listening to an audio stream to be played at 24,000 bits per second, the source sends the audio data to the media player at that rate. The player buffers a certain amount of data before starting to play the stream—e.g., ten seconds—in which case there is enough data stored in the buffer to play for that amount of time. But if the buffer empties—that is, if interruptions deplete the buffer and cause the playout to stop—the buffer must be refilled to its original predetermined level before playout restarts. *See generally* ’611 Patent at 2:35–3:19.

In contrast, the patents teach a method in which the media player, if interruptions deplete the buffer, resumes playing without waiting to first build up the buffer to a predetermined level. As shown in Figure 3 (below), if the user buffer is not full, the source sends data to the user computer more rapidly than it is played out. Once the buffer refills, data is then sent to the user computer at the same rate as playout. *See generally* ’611 Patent at 12:63–13:13. The patents refer to this as an “elastic system” in that the speed of data sent to the user computer “stretches” as needed to keep the buffer at the predetermined level. *Id.* at 9:8–10 (“[C]onsider the server buffer and the media player buffer to be an elastic system that between the two [buffers] stores (for example) up [to] 30 seconds of audio data.”).

Fig. 3




Many of the parties' disputes relate to whether the claims require "the participation of the user system," despite that the claims have no express language requiring such participation. *See, e.g.*, Dkt. No. 51 at 15 (asserting "the method requires that the user buffer, as part of the implementation of the method, transmit its received rate back to the server for comparison and determination"); *id.* at 20–21 (asserting "[t]he claim requires that the feedback from the user system to the server be managed, as specified in the patent, otherwise the limitation 'sufficient for the user system to begin playing back' has no meaning"). The specification does, however, disclose a "feedback manager" that synchronizes the user computer and the media server. The feedback manager

acknowledges the receipt of serialized data packets or requests the next set of packets. This enables the server to track the status of the buffer on each user's system. *See* '611 Patent at 10:42–52. But notably none of the claims in the patents recite a "feedback manager."

Most of the disputes involve Claim 1 of the '611 Patent, which, with its disputed terms in bold, recites:

> 1. A method for distributing streaming media via a data communications medium such as the Internet to at least one **user system** of at least one user, the streaming media comprising a plurality of sequential media data elements for a digitally encoded audio or video program, the **user system being assumed to have a user buffer for receiving media data and facilities to play back the streaming media** at a playback rate for viewing or listening by said at least one user, said method comprising:
>
> sending initial streaming media elements to the **user system** at an initial sending rate more rapid than the playback rate, **to fill the user buffer**; and
>
> configuring the initial streaming media elements so that the amount of said initial elements, and said initial sending rate, are **sufficient for the user system to begin playing back the streaming media while the user buffer continues to fill**; and
>
> **after the user buffer has been filled**, sending further streaming media data elements to the **user system at about the playback rate**; and
>
> wherein the media data elements is sent at a rate that matches the constant fill rate of a server buffer, and is **received at the same rate** by the **user computer** if there are no interruptions in the transmission of media data between the server and the user's computer.

'611 Patent at 15:55–16:9.

## II. LEGAL STANDARDS

### A. Generally

"[T]he claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc). As such, if the parties dispute the scope of the claims, the court must determine their meaning. *See, e.g.*, *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1317 (Fed. Cir. 2007) (Gajarsa, J., concurring in part); *see also Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 390 (1996), *aff'g*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc).

Claim construction, however, "is not an obligatory exercise in redundancy." *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). Rather, "[c]laim construction is a matter of [resolving] disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims . . . ." *Id.* A court need not "repeat or restate every claim term in order to comply with the ruling that claim construction is for the court." *Id.*

When construing claims, "[t]here is a heavy presumption that claim terms are to be given their ordinary and customary meaning." *Aventis Pharm. Inc. v. Amino Chems. Ltd.*, 715 F.3d 1363, 1373 (Fed. Cir. 2013) (citing *Phillips*, 415 F.3d at 1312–13). Courts must therefore "look to the words of the claims themselves . . . to define the scope of the patented invention." *Id.* (citations omitted). The "ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, *i.e.,* as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1313. This "person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.*

Intrinsic evidence is the primary resource for claim construction. *See Power-One, Inc. v. Artesyn Techs., Inc.*, 599 F.3d 1343, 1348 (Fed. Cir. 2010) (citing *Phillips*, 415 F.3d at 1312). For certain claim terms, "the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314; *see also Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005) ("We cannot look at the ordinary meaning of the term . . . in a vacuum. Rather, we must look at the ordinary meaning in the context of the written description and the prosecution history."). But for claim terms with less-apparent meanings, courts consider "those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean . . . [including] the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Phillips*, 415 F.3d at 1314.

### B. Indefiniteness

"[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). The claims "must be precise enough to afford clear notice of what is claimed" while recognizing that "some modicum of uncertainty" is inherent due to the limitations of language. *Id.* at 909. "Indefiniteness must be proven by clear and convincing evidence." *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017).

## III. THE LEVEL OF ORDINARY SKILL IN THE ART

The level of ordinary skill in the art is the skill level of a hypothetical person who is

presumed to have known the relevant art at the time of the invention. *In re GPAC*, 57 F.3d 1573, 1579 (Fed. Cir. 1995). In resolving the appropriate level of ordinary skill, courts consider the types of and solutions to problems encountered in the art, the speed of innovation, the sophistication of the technology, and the education of workers active in the field. *Id.* Importantly, "[a] person of ordinary skill is also a person of ordinary creativity, not an automaton." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007).

Here, Technius says a skilled artisan at the time of invention "would have had a bachelor's degree in telecommunications or the like, and/or two or more years of industry experience in the technical implementation of digital transmission of data over the internet." Dkt. No. 51 at 9. WAG does not challenge this level of skill. Accordingly, the Court adopts Technius's characterization for its analysis, except it limits the amount of experience to two years.

## IV. THE DISPUTED TERMS

### A. "user system" / "user computer" ('611 Patent, Claims 1, 8, 14; '839 Patent, Claim 1)

| WAG's Construction | Technius's Construction |
|---|---|
| Plain and ordinary meaning.<br>Not indefinite.<br>Not subject to 35 U.S.C. § 112 ¶ 6 | Indefinite.<br>Alternatively, "conventional computer with internet communications, storage, buffering, and audio/video playback functionality, with the ability to report its buffering state back to the server, excluding those devices that are specifically excluded in the specification, including internet radios, internet appliances, palmtops, PDAs (Personal Digital Assistants), and wireless phones" |

Claim 1 of the '611 Patent recites:

> 1. A method for distributing streaming media via a data communications medium such as the Internet to at least one **user system** of at least one user, the streaming media comprising a plurality

> of sequential media data elements for a digitally encoded audio or video program, the **user system** being assumed to have a user buffer for receiving media data and facilities to play back the streaming media at a playback rate for viewing or listening by said at least one user, said method comprising:
>
> sending initial streaming media elements to the **user system** at an initial sending rate more rapid than the playback rate, to fill the user buffer; and
>
> configuring the initial streaming media elements so that the amount of said initial elements, and said initial sending rate, are sufficient for the **user system** to begin playing back the streaming media while the user buffer continues to fill; and
>
> after the user buffer has been filled, sending further streaming media data elements to the **user system** at about the play-back rate; and
>
> wherein the media data elements is sent at a rate that matches the constant fill rate of a server buffer, and is received at the same rate by the **user computer** if there are no interruptions in the transmission of media data between the server and the **user's computer**.

'611 Patent at 15:55–16:9 (emphasis added). Claims 8 and 14 include similar system-and-computer language. *Id.* at 17:17–52. So does Claim 1 of the '839 Patent. '839 Patent at 15:58–16:25.

Technius makes two challenges to these claims. First, they are indefinite because there is no antecedent basis for "user computer" in the claims' last limitation. Dkt. No. 51 at 10. Second, even if "user system" provides the necessary antecedent basis, the term is subject to 35 U.S.C. § 112 ¶ 6, and the specification discloses a user buffer that actively exchanges information with the server buffer to create the "elastic system" of the claims. *Id.* at 11. And if § 112 ¶ 6 applies, the disclosed user computer excludes "internet radios, internet appliances, palmtops, PDAs (Personal Digital Assistants), and wireless phones." *See* '611 Patent at 6:49–57.

WAG replies that a skilled artisan would understand "user system" as the antecedent basis

for "user computer," and that the specification uses the terms interchangeably. Dkt. No. 43 at 5. Also, Technius has not overcome the presumption that "user computer" is not subject to means-plus-function treatment. Dkt. No. 55 at 2.

The Court agrees with WAG. First, a skilled artisan would have been at least reasonably certain that "user computer" refers to the previously recited "user system." Notably, Technius fails to provide any evidence a skilled artisan would interpret the phrase differently.[2] The method is directed to transmitting data to a "user system," and the claims recite that the sent data is received by the "user computer," effectively equating the two. Second, Technius has not presented any evidence a skilled artisan would understand "user computer" in these claims as a nonce term, and thus has not overcome the presumption that 35 U.S.C. § 112 ¶ 6 does not apply. Accordingly, the Court holds "user system" provides antecedent basis for "user computer," and that this term is not governed by 35 U.S.C. § 112 ¶ 6.

**B. "user buffer" ('611 Patent, Claims 1, 8, 14; '839 Patent, Claim 1)**

| WAG's Construction | Technius's Construction |
|---|---|
| Plain and ordinary meaning | "a data storage mechanism that is part of the user system for receiving media data that performs the function of receiving at the same rate" |

Technius says the "user buffer" of the claims has a specific function and provides specific

[2] Citing *Halliburton Energy Servs. Inc. v. MI LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008), Technius incorrectly states that "[w]hen a term in a claim has no antecedent basis, the term is indefinite." Dkt. No. 51 at 10. *Halliburton*, however, only says "a claim *could* be indefinite if a term does not have proper antecedent basis." *Halliburton*, 514 F.3d at 1249 (emphasis added). *See also Bose Corp. v. JBL, Inc.*, 274 F.3d 1354, 1359 (Fed. Cir. 2001) ("[T]he failure to provide explicit antecedent basis for terms does not always render a claim indefinite. If the scope of a claim would be reasonably ascertainable by those skilled in the art, then the claim is not indefinite.") (quoting MPEP § 2173.05(e) (6th ed. Rev. 1, Sept. 1995)).

elements. Dkt. No. 51 at 13. "Without a specialized buffer," says Technius, "there would be no mechanism by which the system could determine a fill rate, and no manner for determining when . . . 'the user buffer has been filled" as required by the claims. *Id.* at 14. Thus, the buffer must be more than just a buffer and provide that missing mechanism. WAG, however, cites the specification's description of a "user buffer" as "a conventional computer storage mechanism such as a hard disk, or, preferably, an electronic storage arrangement such as Random Access Memory (RAM)." Dkt. No. 43 at 14 (quoting '839 Patent at 6:30–33). In WAG's view, Technius "simply uses a surplusage of words to insert additional limitations into the claims." *Id.*

The Court agrees with WAG. Technius's position on this term is part of a larger argument that many of the disputed terms have some other-than-ordinary meaning because otherwise the claims would be invalid as anticipated or obvious.[3] For example, for this term Technius says the recited "user buffer" must perform a specific function to make the claimed invention work. Dkt. No. 51 at 13 ("If the user buffer were 'well-known' and 'used in accordance with its conventional meanings' . . . there would be no claimed invention."). Elsewhere, Technius says the claimed systems and methods require some sort of feedback mechanism to work. *See, e.g.*, *id.* at 20–21 (asserting "[t]he claim requires that the feedback from the user system to the server be managed, as specified in the patent, otherwise the limitation 'sufficient for the user system to begin playing back' has no meaning").

At the hearing, Technius recognized the perhaps premature nature of this position at the claim construction phase, but Technius's counsel stressed what he called his obligation to raise

[3] At the hearing, Technius sometimes referred to this as "inherency," seemingly to suggest that additional limitations must be inherent in the claims or they would be anticipated or obvious in light of the prior art.

every issue "as early and as often as possible." Technius also noted that it had no "significant problems or problems at all" with the Courts preliminary constructions,[4] which for this term was "plain and ordinary meaning." While the Court recognizes Technius's need for zealous advocacy, the claims must be construed *before* any determination of anticipation or obviousness. *See Key Pharm. v. Hercon Labs. Corp.*, 161 F.3d 709, 714 (Fed. Cir. 1998) ("a determination of anticipation, as well as obviousness, involves two steps. First is construing the claim . . . followed by, in the case of anticipation or obviousness, a comparison of the construed claim to the prior art."). Accordingly, the Court rejects Technius's position and will give this term a "plain and ordinary meaning" construction.

### C. "received at the same rate" ('611 Patent, Claims 1, 8, 14)

| WAG's Construction | Defendant's Construction |
|---|---|
| Plain and ordinary meaning.<br>Not indefinite | Indefinite.<br>Alternatively: "requiring the participation of a user system that receives at the constant fill rate of a server buffer and must affirmatively provide that information back to the server" |

This is the first of several terms that Technius says impose a requirement that the user system provide information back to the server. Here, in line with its "inherency" argument noted above, Technius says "there must be a manner for the implemented system to know that the media at the [user system's buffer] is being 'received at the same rate' as the constant fill rate of the server buffer" or the claim doesn't work. Dkt. No. 51 at 15. Put another way, "the 'flexible system' of the claimed invention requires an interactive feedback between the server, server buffer, user

[4] For all but one of the disputed terms—"after the user buffer has been filled"—the Court adopts its preliminary constructions for the disputed terms.

computer/system and user buffer," and any attempt to "disconnect the interaction would render the claims inoperative." *Id.* at 16. WAG replies that this assertion is "misplaced" because "in the steady-state condition the server buffer becomes a mere pass-through, and thus, assuming no interruptions to the client, the client receives this media data at the same rate that the server does from the media source." Dkt. No. 55 at 6.

The Court agrees with WAG. Although Technius argues the claims are inoperable without some feedback mechanism, it confuses "inoperability" of a claim with "inoperability" of a purported commercial embodiment. "A *claim* is inoperable when it contains a limitation that is impossible to meet." *Classified Cosmetics, Inc. v. Del Labs., Inc.*, 208 F. App'x 939, 941 (Fed. Cir. 2006) (citing *Process Control Corp. v. HydReclaim Corp.*, 190 F.3d 1350, 1359 (Fed. Cir. 1999)) (emphasis added). In *Process Control*, for example, the claim "require[d] determining a quantity from the sum of that exact same quantity and something else, or symbolically, A = A + B, which is impossible, where, as here, B is not equal to zero." *Process Control*, 190 F.3d at 1359. The court held the clause at issue "embodies an inoperable method that violates the principle of conservation of mass." *Id.*

Here, Technius doesn't show that a limitation is impossible to meet, but only that other unclaimed elements might be necessary for a commercial embodiment to achieve the benefits extolled by the specification. That alone doesn't support Technius's construction or the indefiniteness of the claim term. Accordingly, the Court will give this term a "plain and ordinary meaning" construction.

**D. "being assumed to have a user buffer for receiving media data and facilities to play back the streaming media" ('611 Patent, Claims 1, 6, 14; '839 Patent, Claim 1)**

| WAG's Construction | Technius's Construction |
|---|---|
| Plain and ordinary meaning.<br>Not indefinite | Indefinite.<br>Alternatively: "requiring the participation of a user buffer at the user system" |

The parties' arguments for this phrase generally track those made for the prior terms. *See* Dkt. No. 51 at 16 (referring to arguments made for other terms). Technius also asserts the preamble is limiting. *Id.* The Court agrees with the latter, but the phrase does not require participation of the user buffer for the same reasons set forth above. The Court construes this term as "having a user buffer for receiving media data, and facilities to play back the streaming media" and holds the preamble is limiting.

**E. "to fill the user buffer" ('611 Patent, Claims 1, 8, 14)**

| WAG's Construction | Technius's Construction |
|---|---|
| Plain and ordinary meaning.<br>Not indefinite | Indefinite.<br>Alternatively: "requiring participation by the user system to affirmatively inform the server buffer of the fill status of the user buffer" |

Here, too, the parties' arguments generally follow those made for the prior terms. *See* Dkt. No. 51 at 17 ("there is surely a required mechanism present at the user system which transmits the user buffer filling state to the server. This implies that the user system participation is mandatory!"). But for the same reasons noted above, the Court will give this term a "plain and ordinary meaning" construction.

### F. "playback rate" ('611 Patent, Claims 1, 8, 14; '453 Patent, Claims 1, 9, 17)

| WAG's Construction | Technius's Construction |
|---|---|
| Plain and ordinary meaning.<br>("'playback rate' is the rate at which the media will played out in normal rendition, i.e., not in slow motion or sped up," Dkt. No. 43 at 3) | "a constant rate at which media data will be played back by the user system" |

Technius agrees with WAG that "'playback rate' is the rate at which the media will be played out in normal rendition, *i.e.*, not in slow motion or [speeded] up." Dkt. No. 51 at 18 (quoting Dkt. No. 43 at 3). The Court therefore adopts that construction for the term.

### G. "at about the playback rate" ('611 Patent, Claims 1, 8, 14; '839 Patent, Claim 1)

| WAG's Construction | Technius's Construction |
|---|---|
| Plain and ordinary meaning.<br>Not indefinite. | Indefinite. |

Technius challenges "about" as a term of degree without objective boundaries in the intrinsic record. Dkt. No. 51 at 19. But according to WAG, the specification provides a "ready yardstick":

> [T]here can be variability in this data delivery process due to networking, disk accesses, and so on, causing the delivery rate of the media data to be variable over short periods of time, typically measured in seconds. But over a longer period of time measured in minutes or tens of minutes or longer, the media data is delivered from source to server at the rate it is generated, and the server in turn provides that media data to the FIFO buffer at that same rate.

Dkt. No. 55 at 9 (quoting '611 Patent at 7:32–39).

Based on that guidance from the specification, the Court preliminarily construed this phrase as "at the playback rate, subject to short term minor variations." At the hearing, Technius indicated it had no "significant problems or problems at all" with that construction, except for the

overarching "inherency" argument it made at the hearing. Having already rejected that "inherency" argument, the Court adopts its preliminary construction of "at the playback rate, subject to short term minor variations."

### H. "sufficient for the user system to begin playing back the streaming media while the user buffer continues to fill" ('611 Patent, Claims 1, 8, 14; '839 Patent, Claim 1)

| WAG's Construction | Technius's Construction |
|---|---|
| Plain and ordinary meaning.<br>Not indefinite | Indefinite.<br>Alternatively: "requiring participation by the user system to affirmatively inform the server buffer of the fill status of the user buffer" |

Technius's arguments are generally the same as its arguments about "required participation" for the prior terms. *See* Dkt. No. 51 at 20–21 (asserting "[t]he claim requires that the feedback from the user system to the server be managed, as specified in the patent, otherwise the limitation 'sufficient for the user system to begin playing back' has no meaning"). For the same reasons noted *supra*, the Court rejects those arguments and will give this term a "plain and ordinary meaning" construction.

### I. "after the user buffer has been filled" ('611 Patent, Claims 1, 8, 14)

| WAG's Construction | Technius's Construction |
|---|---|
| Plain and ordinary meaning.<br>Not indefinite | Indefinite.<br>Alternatively: "requiring participation by the user system to affirmatively inform the server buffer of the fill status of the user buffer" |

Claim 1 recites:

> sending initial streaming media elements to the user system at an initial sending rate more rapid than the playback rate, **to fill the user buffer**;

> . . .
>
> **after the user buffer has been filled**, sending further streaming media data elements to the user system at about the playback rate; and
>
> wherein the media data elements is sent at a rate that matches the constant fill rate of a server buffer, and is received at the same rate by the user computer if there are no interruptions in the transmission of media data between the server and the user's computer.

'611 Patent at 15:63–16:9 (emphasis added); *see also id.* at 17:35–52 (reciting similar language in Claim 8), 19:10–24 (reciting similar language in Claim 14). Technius's arguments that this disputed term is indefinite again track those made with respect to prior terms. *See* Dkt. No. 51 at 21 ("This limitation should also be construed as proposed by Defendant, for the same reasons set forth above, because the same requirement for information known only to the user system is necessary."). For the same reasons specified above, the Court rejects those arguments.

Technius also questions the meaning of this term. According to Technius, "[t]here is no measure or definition for when the buffer is filled, only that any filling is filled." Dkt. No. 51 at 21. As the patent explains when describing the prior art, "When the user connects to the server via the Internet, audio/video output at the user's system is delayed while the user's buffer is filled *to a predetermined level*." '611 Patent at 2:28–31 (emphasis added); *see also id.* at 2:56–59 ("The audio/video material stops playing, and the buffer must be refilled *to its original predetermined level* before playing of the media resumes." (emphasis added)). Based on that explanation from the Background section, the Court offered a preliminary construction of "after the user buffer has been filled to a predetermined level."

That was the only preliminary construction against which WAG pushed back. According to WAG, this phrase doesn't refer to a predetermined level in the *user* buffer, but a predetermined

amount of data in the *server* buffer. Technius did not disagree with that characterization at the hearing.

The Court agrees with WAG. With respect to Figure 1, the patent explains:

> Once a connection is made to a user's computer (e.g., user computer 18), server 12 sends the media data to the user computer in the following manner. First, media data is sent to the user computer at a rate faster than the playback rate, which may be the highest rate that the data connection between the server and the user computer will support, or any lower rate that is a higher rate than the playback rate (referred to herein as a "higher than playback" rate), *until the predetermined amount of data that had been stored in the server buffer has been transferred to the user's computer*. Once the contents of server buffer 14 has been transferred, a steady state condition is reached wherein as each media data element arrives at server 12, it is immediately sent out to the user computer.

'611 Patent at 7:53–65 (emphasis added). This explanation aligns with the claim limitations and persuades the Court this phrase does not require filling the user buffer to a certain level, but rather that the predetermined amount of data in the server buffer has been transferred. The Court therefore construes this term as "after the user buffer has been filled with a predetermined amount of data."

### J. "record" ('839 Patent, Claim 7; '453 Patent, Claims 8, 16, 24)

| WAG's Construction | Technius's Construction |
|---|---|
| Plain and ordinary meaning. | "fixed evidence of identity and nature" |

These dependent claims each recite the step of, "for each of the plurality of user systems, maintaining a *record* of the last streaming media data element that had been sent from the server buffer to the user system, and using the *record* to identify the next streaming media data element in the server buffer to be sent to the user system." '453 Patent at 16:67–17:4 (emphasis added); *see also* '839 Patent at 16:40–44 (similar). This allows each user system to "request[] transmission of the next sequential media data elements following [the] last sequential media data element, as [the] media player requires for continuous and uninterrupted playback." '453 Patent at 4:8–11.

Resisting the notion that a record must be "fixed," WAG says the "record" is constantly changing with each "sending." Dkt. No. 43 at 25 (Resp. to Office Action, Dkt. No. 43-10 at 12). Technius does not dispute this, saying the record is "fixed" "for a period of time, until the last-media-element-sent has been replaced with a new last-media-element-sent at which time a new fixed record is maintained." Dkt. No. 51 at 22. Because the parties appear to agree on the scope of the term, the Court opts for a "plain and ordinary meaning" construction.

### K. "send[ing] . . . as much of said unsent sequential data elements that are in the server buffer as said transport mechanism will accept" ('453 Patent, Claims 1, 9, 17)

| WAG's Construction | Technius's Construction |
|---|---|
| Plain and ordinary meaning.<br>Not indefinite | Indefinite.<br>Alternatively: "requiring participation by the transport mechanism to affirmatively determine the amount of data elements it will accept" |

Here, too, Technius's arguments are the same as those it made for prior terms. *See* Dkt. No. 51 at 23 (asserting "[t]he server must have the capability to control (increase or decrease) the sending rate to be able to transfer the buffer load of data at a rate faster than the 'playback rate'"). For the same reasons noted *supra*, the Court rejects those arguments and will give this term a "plain and ordinary meaning" construction.

### L. "live broadcast" ('453 Patent, Claims 4, 12, 20)

| WAG's Construction | Technius's Construction |
|---|---|
| Plain and ordinary meaning.<br>Not indefinite | Indefinite. |

These dependent claims recite "wherein the streaming media is provided from a live broad-cast." '453 Patent at 16:56–57 (Claim 4); *see also id.* at 17:49–50 (Claim 12), 18:41–43 (Claim

20). Technius stresses "live broadcast" "is not found anywhere in the specification of any of the patents-in-suit." Dkt. No. 51 at 24. "Because it can have numerous meanings, it is indefinite when simply introduced for the first time in a claim without any explanation or definition." *Id.* Technius, however, fails to articulate those allegedly various meanings, much less analyze them from a skilled artisan's perspective to discern whether such a person would be reasonably certain about the term's scope. Because Technius has not carried its burden on indefiniteness, and because this term has a well-understood meaning, the Court will give it a "plain and ordinary meaning" construction.

## V. CONCLUSION

| Disputed Term | The Court's Construction |
|---|---|
| "user system" / "user computer"<br>('611 Patent, Claims 1, 8, 14; '839 Patent, Claim 1) | "User system" provides antecedent basis for "user computer."<br>Not governed by 35 U.S.C. § 112 ¶ 6 |
| "user buffer"<br>('611 Patent, Claims 1, 8, 14; '839 Patent, Claim 1) | Plain and ordinary meaning |
| "received at the same rate"<br>('611 Patent, Claims 1, 8, 14) | Plain and ordinary meaning |
| "being assumed to have a user buffer for receiving media data and facilities to play back the streaming media"<br>('611 Patent, Claims 1, 6, 14; '839 Patent, Claim 1) | "having a user buffer for receiving media data, and facilities to play back the streaming media"<br>The preamble is limiting |
| "to fill the user buffer"<br>('611 Patent, Claims 1, 8, 14) | Plain and ordinary meaning |
| "playback rate"<br>('611 Patent, Claims 1, 8, 14; '453 Patent, Claims 1, 9, 17) | "the rate at which the media will played out in normal rendition, i.e., not in slow motion or speeded up" |

| | |
|---|---|
| "at about the playback rate" ('611 Patent, Claims 1, 8, 14; '839 Patent, Claim 1) | "at the playback rate, subject to short term minor variations" |
| "sufficient for the user system to begin playing back the streaming media while the user buffer continues to fill" ('611 Patent, Claims 1, 8, 14; '839 Patent, Claim 1) | Plain and ordinary meaning |
| "after the user buffer has been filled" ('611 Patent, Claims 1, 8, 14) | "after the user buffer has been filled with a predetermined amount of data" |
| "record" ('839 Patent, Claim 7; '453 Patent, Claims 8, 16, 24) | Plain and ordinary meaning |
| "send[ing] . . . as much of said unsent sequential data elements that are in the server buffer as said transport mechanism will accept" ('453 Patent, Claims 1, 9, 17) | Plain and ordinary meaning |
| "live broadcast" ('453 Patent, Claims 4, 12, 20) | Plain and ordinary meaning |

The Court **ORDERS** each party not to refer, directly or indirectly, to its own or any other party's claim-construction positions in the presence of the jury. Likewise, the Court **ORDERS** the parties to refrain from mentioning any part of this opinion, other than the actual positions adopted by the Court, in the presence of the jury. Neither party may take a position before the jury that contradicts the Court's reasoning in this opinion. Any reference to claim construction proceedings is limited to informing the jury of the positions adopted by the Court.

**SIGNED this 30th day of April, 2026.**



ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE