████████████████████████████████

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF TEXAS**

**MARSHALL DIVISION**

| | | |
|---|---|---|
| WAG ACQUISITION, L.L.C. | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CASE NO. 2:24-cv-00714-JRG |
| | § | |
| TECHNIUS LTD. D/B/A STRIPCHAT.COM, | § | |
| | § | |
| *Defendant.* | § | |
| | § | |

**MOTION BY PLAINTIFF TO STRIKE PORTIONS OF EXPERT REPORTS
OF DEFENDANT'S TECHNICAL EXPERT ZIXIANG XIONG**

███████████████████████████████

## TABLE OF CONTENTS

BACKGROUND ..................................................................................................................................1

Legal Standards.............................................................................................................................. 2

CHALLENGES.................................................................................................................................. 4

I.    WebRTC Server Buffer Opinions........................................................................................... 4

II.    Opinions that Technius's HLS servers are "NOT actively 'sending'" data and do not
"'send' data elements" because "[t]he user system retrieves [them] from the server." ............. 8

III.    "My understanding is that Technius did not use LL-HLS before the WAG patents-in-
suit expired" ................................................................................................................................. 9

IV.    R2 ¶ 149 purported quantification of data transfer based on mere visual inspection 9

V.    Invalidity opinions and charts that apply prior art references not in Technius's
invalidity contentions................................................................................................................ 11

VI.    Indefiniteness assertions constituting pure legal opinions ............................................. 11

VII.    Facially insufficient invalidity contentions ................................................................... 12

CONCLUSION ................................................................................................................................ 12

████████████████████████

## TABLE OF AUTHORITIES

**Cases**                                                                                                                                    **Page(s)**

*Barry v. DePuy Synthes Companies,*
    164 F.4th 896 (Fed. Cir. 2026).................................................................................................... 3

*BMC Software, Inc. v. ServiceNow, Inc.,*
    No. 2:14-CV-903-JRG, 2016 WL 379620 (E.D. Tex. Feb. 1, 2016) ...................................... 2

*Daubert v. Merrell Dow Pharm., Inc.,*
    509 U.S. 579 (1993) ................................................................................................................ 2

*Durkin v. Equifax Check Servs., Inc.,*
    406 F.3d 410 (7th Cir. 2005).................................................................................................11

*Estech Sys. IP, LLC. v. Carvana LLC,*
    2023 WL 3292881 (E.D. Tex. May 5, 2023) ..........................................................................3, 9

*General Elec. Co. v. Joiner,*
    522 U.S. 136 (1997) ...............................................................................................................2, 3

*Godo Kaisha IP Bridge 1 v. Broadcom Ltd.,*
    No. 2:16-CV-134-JRG-RSP, 2017 WL 2839493 (E.D. Tex. Apr. 20, 2017) ......................11

*Knepfle v. J-Tech Corp.,*
    48 F.4th 1282 (11th Cir. 2022) .............................................................................................10

*Kumho Tire Co. v. Carmichael,*
    526 U.S. 137(1999) ............................................................................................................. 2, 10

*02 Micro Intern. Ltd. v. Monolithic Power Systems,*
    467 F.3d 1355 (Fed. Cir. 2006)..............................................................................................11

*Phillips v. AWH Corp.,*
    415 F.3d 1303 (Fed. Cir. 2005).............................................................................................. 8

*In re: Taxotere (Docetaxel) Prods. Liab. Litig,*
    26 F.4th 256 (5th Cir. 2022)................................................................................................... 2

*Treehouse Avatar LLC v. Valve Corporation,*
    54 F.4th 709 (2022) ...............................................................................................................3, 9

*Trudell Med. Int'l Inc. v. D R Burton Healthcare, LLC,*
    127 F.4th 1340 (Fed. Cir. 2025) ...........................................................................................3, 9

*Wi-LAN Inc. v. Sharp Elecs. Corp.,*
    992 F.3d 1366 (Fed. Cir. 2021)............................................................................................ 4

**<u>Rules</u>**                                                                                           **<u>Page(s)</u>**

Fed. R. Evid. 702...............................................................................................................................2, 3

Fed. R. Evid. 703...............................................................................................................................3, 9

Plaintiff hereby moves to strike certain opinions of Defendant's technical expert, Dr. Zixiang Xiong. Dr. Xiong's two expert reports, on invalidity ("R1") and non-infringement ("R2"), his CV, and relevant Xiong deposition pages, are attached as Exhibits A, B, C, and D, to the Declaration of Ari J. Jaffess ("Jaffess Decl."), respectively.

## BACKGROUND

The claims asserted herein concern mechanisms to achieve fast startup and uninterrupted delivery for streaming media over the internet. Defendant operates an internet service that streams live webcam performances in a manner accused of infringing.

Plaintiff separately accuses two distinct delivery mechanisms used by Defendant. One such mechanism is based on the WebRTC protocol, a "real-time" communications protocol. Ex. B ¶ 41. The second such mechanism is based on the HTTP Live Streaming ("HLS") protocol, a broadcast-oriented protocol that breaks a media stream into small segments and enables either live or on-demand content to adapt to internet speeds to ensure uninterrupted playback. Ex. B ¶ 40. Plaintiff alleges that during the relevant period (August 30, 2019-September 4, 2022), Defendant used HLS by default, and WebRTC for paid users, and/or by user selection after starting a session with the default HLS.

Defendant, in its verified response to an interrogatory (Interrogatory No. 4, Jaffess Decl. Ex. E), provided a diagram (Jaffess Decl., Ex. F) representing its system architecture for the relevant period. The accused instrumentalities depicted in Ex. F are the "WebRTC Edges" in "North America (USA)" (top-center of the figure), and, for HLS, the U.S. exit nodes of the "Cloudflare CDN" (center-left of the figure). Among other opinions, plaintiff challenges as unsupported by relevant facts or data opinions throughout Dr. Xiong's R2 report that Technius's WebRTC and HLS facilities lacked certain claimed structures (such as a "server

buffer").

**Legal Standards**

Rule 702, Fed. R. Evid., and a body of Supreme Court precedent (*e.g.*, *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592-93 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999); *General Elec. Co. v. Joiner*, 522 U.S. 136 (1997)) establish threshold requirements for expert testimony, going, *inter alia*, to:

- **Sufficient factual basis:** "sufficient facts or data"
- **Reliability:** use of "reliable principles and methods"
- **Fit:** relevant to the issues and reliably applied to the facts of the case

Because expert testimony "can be both powerful and quite misleading" (*Daubert*, 509 U.S. at 595), the district court's "gatekeeping" function under Rule 702 is important.

**Facts and Data; "*Ipse Dixit*."** Among the types of opinion evidence that may run afoul of these principles are pure "*ipse dixit*" opinions, where an expert seeks to provide an opinion on the momentum of his/her qualifications (however impressive they may be), but wholly lacking any tie of the opinion expressed to the particular facts or data in the case. *See GE v. Joiner*, 522 U.S. at 146 ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."); *BMC Software, Inc. v. ServiceNow, Inc.*, No. 2:14-CV-903-JRG, 2016 WL 379620, at *2 (E.D. Tex. Feb. 1, 2016) (following *GE v. Joiner*); *In re: Taxotere (Docetaxel) Prods. Liab. Litig.*, 26 F.4th 256, 269 (5th Cir. 2022) (improper reliance on another's unsupported opinion).

Moreover, Rule 702 was strengthened in 2023, to add a requirement to demonstrate the admissibility predicates by a "more likely than not" standard, and adding to those requirements not only that the *expert* reliably applied acceptable principles and methods,

but also that the "*expert's opinion* reflects a reliable application of the principles and methods to the facts of the case"—further taking the test beyond the "trust me" level, and requiring from any expert, no matter how qualified, a specific and *intrinsically persuasive* factual demonstration to support the opinion.

**Relevance and Fit; Claim Construction**. The relevance and fit requirements for admitting an opinion on patent infringement or validity (as the opinions challenged herein are) cannot be met if the opinion depends on a legally improper claim interpretation. Magistrate Judge Payne's preliminary constructions (Jaffess Decl., Ex. G) presently govern absent further order, and Dr. Xiong has professed to be going by those constructions. Ex. A at 2-3; Ex. B ¶ 68; Ex. D, 37:19-24 (Xiong deposition transcript herein).

"Expert opinion that contradicts the court's claim construction is not helpful to the jury and, hence, should be excluded as unreliable under Rule 702(a)." *Barry v. DePuy Synthes Companies*, 164 F.4th 896, 903 (Fed. Cir. 2026). *See also Trudell Med. Int'l Inc. v. D R Burton Healthcare, LLC,* 127 F.4th 1340, 1349-50 (Fed. Cir. 2025) (same); *Treehouse Avatar LLC v. Valve Corporation*, 54 F.4th 709 (2022) (striking opinion was proper where based on construction "materially different" from the court's); *Estech Sys. IP, LLC. v. Carvana LLC*, 2023 WL 3292881, at *2 (E.D. Tex. May 5, 2023) (excluding opinion that restricted the claim to a specific, narrow method of execution rather than its broader language). "Analytic gaps," *e.g.*, conclusions drawn from data too dissimilar from the facts of the case, provide another ground for excluding an expert opinion. *GE v. Joiner*, 522 U.S. at 144-45.

Opinion evidence may also be excluded for violating other rules. "Even if testimony is reliable, it may still be excluded if it relies on information that violates the [Federal] [R]ules [of Civil Procedure]." *Estech,* 2023 WL 3292881, at *2 (excluding a further opinion based on

- 3 -

late-produced material contrary to a scheduling order). Although per Rule 703 an expert's

opinions may rely on matters not themselves admissible into evidence, an expert's report

cannot be used simply as a conduit for hearsay. *See Wi-LAN Inc. v. Sharp Elecs. Corp.*, 992

F.3d 1366, 1375 (Fed. Cir. 2021).

## CHALLENGES

### I.     WebRTC Server Buffer Opinions

Plaintiff moves to strike opinions in Dr. Xiong's non-infringement report (Ex. B) that

Technius's WebRTC servers use "a buffer-less ingestion setup," "a buffer-less approach," "is

buffer-less," or has "[n]o server buffer," including those set forth in ¶¶ 88, 92, 95, 103, 110,

119, 125, 130, 134, 139, and 142, and the further opinion as set forth in ¶ 92 in particular,

seeking to distinguish a specific buffer identified in Technius's WebRTC implementation by

Plaintiff's expert, Keith Teruya.

The opinions about the accused WebRTC server being "buffer-less," etc., are repeated

eleven times throughout the non-infringement report. Paragraph 92 in particular contains

one of those repetitions, but adds a *further* assertion in its second sentence, concerning Mr.

Teruya's finding of a buffer as claimed, in Defendant's WebRTC Edge server code[1]:

> 92. The WebRTC server used by Technius does not have a server buffer, it serves as a
> buffer-less ingestion point. *The socket buffer mentioned in paragraph 108 of Mr.*
> *Teruya's report is the lower operation system layer socket buffer.*

Ex B. ¶ 92 (emphasis added). Such statements, citing nothing, wholly attributing significant

assertions to unspecified "conversations," taking liberties with words, making obvious

factual errors, or making dismissive, reductive attacks on his opponent's qualifications (*e.g.*,

---

[1] Technius's Ilya Mikhaelis confirmed in his deposition that the 2022 code base that Mr. Teruya said he had examined was representative of Technius's WebRTC implementation during the alleged infringement period. *See* Ex. H, 42:8-21.

Ex. B ¶ 12), typify both of Dr. Xiong's reports.

The "¶ 108" of Mr. Teruya's infringement report referenced in Ex. B ¶ 92 is reproduced in Ex. I hereto (together with the paragraphs that supply the context for ¶ 108, encompassing ¶¶ 71-74 and 107-110). Mr. Teruya's report addresses contents of server configuration files and source code for Technius WebRTC edge servers, and identifies therein a "video_socket_send_buffer" that Mr. Teruya opines evidences the accused "server buffer" in a Selective Forwarding Unit (SFU), named a "Dispenser" object, in Defendants' WebRTC edge servers. Mr. Teruya pointed to a README file in the code stating that the Dispenser is a per-user software object created to join users to a performer's WebRTC stream. Ex. I ¶ 73.

Dr. Xiong's reports do not, anywhere, reference contents of Technius source code, configuration files, interrogatory responses, or any other documents, to support the opinions set forth in ¶¶ 88, 92, 95, 103, 110, 119, 125, 130, 134, 139, and 142. The sole bases Dr. Xiong discloses for these views are in Ex. B ¶¶ 41-42 and 86-88. There, speaking without specific reference to Technius's *WebRTC edge server implementation*, he states that the WebRTC *protocol*, as a "peer-to-peer" facility, seeks to "achiev[e] sub-500ms latency" and "pushes video frames as soon as they are encoded." He also states, however, in Ex. B ¶ 42, that "modern WebRTC platforms *often integrate SFUs* to scale to larger groups [*i.e.*, not peer-to-peer], using sophisticated *server-side buffers*" (emphasis added). He then adds, in italics, after addressing characteristics of the WebRTC *protocol*, his sole statement purporting to tie this to Technius's implementation of its WebRTC *servers*:

> *My understanding from conversation with Technius engineer is that Technius employed such a buffer-less **ingestion** approach during the WAG alleged infringement period.*

Xiong non-infringement report ¶ 88 (italics in original; bold emphasis added).

- 5 -

This statement is clearly intended to convey the impression that (a) the WebRTC protocol in general is peer-to-peer and intended to be buffer-less, and (b) Dr. Xiong was told by a Technius engineer that Technius's WebRTC *ingestion* used a "buffer-less" approach, and (c) it is therefore his opinion that Technius's WebRTC *servers* (specifically, the accused WebRTC "edge" servers) were likewise buffer-less.

Dr. Xiong's approach has a clear analytic gap. Dr. Xiong acknowledges in Ex. B ¶ 87 that "ingestion" concerns "incoming packets" (each performer feeds to one Technius "Origin" server (*e.g.,* ██████████), as shown in Ex. F ("ingress," red lines)). WebRTC *service*, on the other hand, occurs at WebRTC Edges, to Users ("egress," green lines). There are multiple Users per stream (*not* "one-to-one"), from the server. *See* Ex. D, Xiong Dep., 75:21-76:1. Mikhaelis Dep., Jaffess Decl., Ex. H 62:15-64:19 Dr. Xiong further acknowledges (in Ex. B ¶ 42) that a "modern" WebRTC server uses an SFU, designed to distribute a given WebRTC stream to multiple recipients ("scale to larger groups"). "Ingress" (ingestion) and "egress" (service) are different processes (in any case certainly not supported as being the same).

Dr. Xiong's R2 report fails to show any correspondence between one-to-one WebRTC "ingestion" as he addresses in his opinions, and the separate one-to-many process of *serving* the stream, which is what is relevant to the claims. His terminology improperly confuses two distinct portions of Technius's distribution pipeline. He reports no inspection of server code, configurations, or other documents, or of the software "Dispenser" object of the WebRTC Edge server code where Mr. Teruya stated he found the relevant buffer. He does not even report any *conversations* with the Technius engineer as to WebRTC *serving*. Thus, there is a clear "analytic gap" in the R2 Report between the alleged "buffer-less" WebRTC "ingestion" that Dr. Xiong chose to address, on the one hand, and the accused

- 6 -

WebRTC edge server processes, on the other. Dr. Xiong's repetition of the word "ingestion" no fewer than six times makes the limited scope of his specific assertions unmistakable, yet these expressions are invariably followed by a broader but unsupported exculpatory conclusion. His factual analysis logically fails to reach what is alleged. Defendant has thus not provided enough to meet its burden on admissibility of the "no buffer" opinions.

Dr. Xiong's reliance on information allegedly obtained from the "Technius engineer" is also at odds with then recent Rule 30(b)(6) deposition testimony by Mr. Mikhaelis, Technius's streaming technology lead. Well after being served with infringement contentions identifying the claimed server buffers in Technius's servers, and the initial burst observed upon streaming startup, Mr. Mikhaelis was asked for Technius's technical basis for asserting non-infringement (a Rule 30(b)(6) topic). He identified only one technical basis—use of open-source technology—and then, when asked if he had "anything else," he testified: "I cannot. Cannot say anything else." Ex. H, 115:18-118:3. Dr. Xiong should not be permitted to rely second-hand on alleged factual input from Technius going beyond its Rule 30(b)(6) responses.

Moreover, even after his misplaced analysis of "ingestion," Dr. Xiong still had to deal with Mr. Teruya's specific report of the claimed server buffer. In Ex. B ¶ 92, Dr. Xiong sought to deflect this by characterizing it as "the lower operation system layer socket buffer." But this begins and ends with the bare characterization itself. Dr. Xiong could have addressed the source code and configuration files cited by Mr. Teruya and/or discussed Mr. Teruya's assertions with the Technius engineer, but he does not appear to have done either, or anything else toward that end. He provides a one-line characterization instead, without providing any basis for the characterization, or what, if anything, it implied. The result is

not only unsupported, but prejudicial, and should be stricken.

## II.    Opinions that Technius's HLS servers are "NOT actively 'sending'" data and do not "'send' data elements" because "[t]he user system retrieves [them] from the server."

Dr. Xiong's opinions improperly seek to narrow the construction of "sending initial streaming media elements to the user system" ('611 patent, *e.g.*, cl. 1), or corresponding terms of the '839 and '453 patents. The Preliminary Constructions do not address these terms. *See* Ex. G. Neither party requested a construction that would limit what the word "send" means in the claims. Under *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005), the general approach is to use plain and ordinary meaning for unconstrued claims. Plain and ordinary meaning thus prevails here. Dr. Xiong expressly undertook to follow the Court's constructions, *see, e.g.*, Ex. A, at 2-3; Ex. B ¶ 68; Ex. D, 37:19-24.

In his R2 Report, Dr. Xiong repeatedly and literally *admits* that HLS servers do in fact "send" data in the plain and ordinary sense. *See, e.g.,* Ex. B ¶¶ 29 ("HTTP … web server *sends* the file data … as fast as possible"), 84 ("HLS … server … "*sends* the file as fast as possible").

But to avoid these claim terms, Dr. Xiong would assume the role of lexicographer, usurping the role of the Court. According to Dr. Xiong, merely transmitting media data over the wire from server to user *does not count* as "sending," because neither the Technius WebRTC nor its HLS server is "actively" sending the data (wording remarkably repeated at ¶¶ 95, 110, 125, 134, and 142). In fact, according to Dr. Xiong, the HLS server doesn't "send" *anything at all* because "the user system *retrieves* the packets," an assertion he reflexively repeats over and over, *e.g.*, in ¶¶ 94, 101, 109, 111, 117, 124, 133, and 141.

Dr. Xiong would thus read into the claims a further unstated requirement, beyond any plain and ordinary meaning (as Dr. Xiong himself uses the word "send" in closely related contexts)—that the claimed "sending" *must be* at the initial impetus of the sender. No such

- 8 -

construction has been made, nor can an expert's mere say-so in this regard be accepted. *Trudell*, *Treehouse*, *Estech*, and numerous like cases have rejected expert opinions that would read additional limitations into the claims.

### III.    "My understanding is that Technius did not use LL-HLS before the WAG patents-in-suit expired"

LL-HLS is not the only type of HLS accused of infringement. But nevertheless, this more limited assertion, at Ex. B ¶ 43, is presented improperly. It references nothing factual, or anything at all, leading to this "understanding." Dr. Xiong is relying at best on an unidentified third person's opinion, not stating his own opinion. If the statement is intended to be taken as *factual*, under Rule 703 the factual assertion should not go to the jury. Moreover, verified interrogatory responses state that Technius began to use LL-HLS in 2021 (Ex. E (Response to Interrogatory No. 16)). Dr. Xiong should not be permitted to provide opinions based on "understandings" to the contrary.

### IV.    R2 ¶ 149 purported quantification of data transfer based on mere visual inspection

In Ex. B ¶ 149, Dr. Xiong criticizes Mr. Teruya's quantitative analysis of packet capture evidence of the initial portion of a WebRTC transmission for a performer stream from Defendant's accused services during the term of one of the '453 patent. Plaintiff produced the actual "PCAP" capture file (WAG_TECHNIUS 2000838) itself (which included data sizes, timestamps, and bits indicating payload video frame completion), as well as a visual illustration of arriving raw data volume, in a plot (Jaffess Decl., Ex. I, figure from ¶¶ 75 and 81), which, as Mr. Teruya stated in his ¶ 75, he generated from the PCAP data using Microsoft Excel. *See* Teruya infringement report ¶¶ 75-97 (Ex. I), which at ¶¶ 81-97 contains a quantitative analysis of the PCAP data.

Dr. Xiong does not report anything regarding the PCAP file or even mention it. Instead,

without referencing any facts or data, other than his own visual inspection, he makes the following assertions, in Ex. B ¶ 149:

- "The initial spike in the graph is only about 20% larger than the two subsequent spikes in the graph."
- "The spike spans about one unit of time, from t1.5 to t 2.5 and appears to transfer about 220,000 units of data."
- "[T]the average units received in one unit of time for the remainder of the graph is about 170,000."
- "[T]he "spike" of 220,000 is only 23% greater than average transmission rate."
- "[I]f it were extra data, it would only be ¼ of a second of extra data."
- "If it were from a buffer … it would be typical of well-known prior art buffers."

Dr. Xiong had available to him the same PCAP file that Mr. Teruya used to generate his plot, and to analyze directly (not from just visually assessing the plot) what the data represented. He had the source code for the accused server and could have run his own tests. He fails to report doing either of these things. Even in his "eyeballing," he inexplicably changed the 240,000 figure in the graph to 220,000. He gave two different percentages, 20% and 23%. He did not correlate the height of the peak to the volume of data. He minimized the width of the peak with no basis. His statement that, "In discussions with Technius's software engineer, he indicated that such spikes are seen in about one of ten such start up measurements" (Ex. B ¶ 149), is a second-hand, unsupported opinion that serves only to propagate hearsay.[2] He referred to nothing to support his assertion about "prior art buffers" or whether he was referring to server or client-side buffers.

These opinions should be excluded because they do not reflect any basis beyond visual "eyeballing" of a graph, and speculation. *See, e.g.*, *Kumho Tire*, 526 U.S. at 154 (eyeballing tire tread to opine on reason for tread separation from tire carcass); *Knepfle v. J-Tech Corp.*,

---

[2] Mr. Mikhaelis himself, as a Rule 30(b)(6) witness, failed to make any such statement when asked for all bases for non-infringement. Ex. H, 117:8-118:3.

48 F.4th 1282, 1295 (11th Cir. 2022) (expert "eyeball[ed]" helmet liner to determine compression rather than "us[ing] calipers or 3D scanning technology"); *Durkin v. Equifax Check Servs., Inc.*, 406 F.3d 410, 420 (7th Cir. 2005) (excluding expert testimony relying on linguistics rather than survey evidence to prove confusion claims).

## V.    Invalidity opinions and charts that apply prior art references not in Technius's invalidity contentions

The R1 report (invalidity) relies on six references that were not in Technius's Invalidity Contentions (Jaffess Decl., Ex. J, at 2): U.S. Patent No. 6,711,622 to Fuller, et al.; U.S. Patent No. 6,233,226 to Gringeri, et al.; U.S. Patent No. 5,442,390 to Hooper, et al.; U.S. Patent No. 6,944,221 to Keesman, et al.; U.S. Patent No. 5,897,230 to Wang, et al.; and RFC 2326 Real Time Streaming Protocol, April 1998 ("RFC 2326"). This violates Local Patent Rules 3-3 and 3-6(d). Plaintiff is prejudiced by this violation. These additional references were not produced in other discovery. Moreover, these additional references, presented as 35 U.S.C. § 102 anticipation references, in charts that often fail even to address all of the elements of the challenged claims (*see* VII below), are plainly deficient. It would be unduly burdensome for the Plaintiff, as well as the Court and the jury, to have to consider numerous additional alleged invalidity defenses based on them, where they are bound to fail. *See, e.g.*, *Godo Kaisha IP Bridge 1 v. Broadcom Ltd.*, No. 2:16-CV-134-JRG-RSP, 2017 WL 2839493, at *2 (E.D. Tex. Apr. 20, 2017); *02 Micro Intern. Ltd. v. Monolithic Power Systems*, 467 F.3d 1355, 1366 (Fed. Cir. 2006) ("we see nothing in the Federal Rules that is inconsistent with local rules requiring the early disclosure of infringement and invalidity contentions and requiring amendments to contentions to be filed with diligence.").

## VI.    Indefiniteness assertions constituting pure legal opinions

The bullet items on pages 37-39 of the R1 Report were copied verbatim from the same

matter at pages 10-13 of Defendant's Invalidity Contentions (Ex. J, at 10-13). In each case, the reason given for the assertion of indefiniteness is "because it uses" (or "because they use") a quoted phrase from the claim, with nothing further said. These are pure legal assertions, opinions based solely on claim language, with no factual or technical basis provided. Such assertions are not the province of an expert and should be stricken.

## VII.    Facially insufficient invalidity contentions

The '611 patent (in Lim. 1.B) and '839 patent (in Lim. 1.D) both recite initial streaming elements "sufficient for the user system to begin play[back] *while the user buffer continues to fill*." Report R1 *per se* only states the single conclusion (Ex. A, at 35) that a sole reference, Zheng (Ex. A, at 27), discloses this. For the substance, however, Report R1 relies entirely on attached claim charts, Appendices A - CC (too numerous and voluminous to attach here but separately provided to the Court on a flash drive per the DCO). However, *none* of the 15 charts for the '611 patent (Apps. A-K and Z-CC) and the 7 charts for the '839 patent (Apps. L-O, and W-Y) provide *any* evidence in their right-hand columns that even purports to address "while the user buffer *continues to fill*." Indeed, for most of these charts [Apps. A-K and Z-CC], the words "while the user buffer continues to fill" *do not even appear* on the *left-hand side* of the charts. *See, e.g.*, App. A at 3. Apps. Z, AA, BB, and CC (for the '611 patent), are even worse, in that they materially *re-write* Lim. 1.B more favorably to Defendant. Apps. W-Y, for the '839 patent, are further deficient in that they purport to address a dependent claim (7) but entirely fail to include the base claim (1). All of the above-identified charts and accompanying opinions are thus clearly unreliable and must go.

## CONCLUSION

For the foregoing reasons, the opinions challenged herein should be stricken.

Date: April 29, 2026

Respectfully submitted,

*/s/ Ari J. Jaffess*
Ari J. Jaffess (*pro hac vice*)
ari.jaffess@listonabramson.com
Ronald Abramson (*pro hac vice*)
ron.abramson@listonabramson.com
David G. Liston (*pro hac vice*)
david.liston@listonabramson.com
Alex G. Patchen (*pro hac vice*)
alex.patchen@listonabramson.com
Gina K. Kim
Texas Bar No. 24097937
gina.kim@listonabramson.com
**Liston Abramson LLP**
The Chrysler Building
405 Lexington Avenue, 46th Floor
New York, NY 10174
Email: docket@listonabramson.com
212-257-1630

Wasif H. Qureshi
Texas Bar No. 24048155
wqureshi@jw.com
**Jackson Walker LLP**
1401 McKinney, Suite 1900
Houston, Texas  77010
Telephone: (713) 752-4521

*Counsel for WAG Acquisition, L.L.C.*

- 13 -

███████████████████████████

## CERTIFICATE OF CONFERENCE

Pursuant to Local Rule CV-7(h), counsel for Plaintiff, Ari. J. Jaffess, Alex G. Patchen, and M. Michael Lewis, met and conferred with counsel for Defendant, Joeseph J. Zito and Benjamin Deming, on April 28, 2026, in a good-faith effort to narrow the area of disagreement in connection with this motion.  The parties did not reach an agreement because Defendant believes its expert reports to be appropriate. Discussions conclusively ended in an impasse, leaving an open issue for the court to resolve.

*/s/ Ari J. Jaffess*
Ari J. Jaffess

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that as this motion contains DESIGNATED MATERIAL, it has been filed under seal pursuant to the Protective Order in this case (Dkt. No. 26).

*/s/ Ari J. Jaffess*
Ari J. Jaffess

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document and all attachments thereto are being filed electronically in compliance with Local Rule CV-5(a). However, as these documents are being filed under seal, I caused this document and all attachments hereto to be served April 29, 2026, on counsel of record via email.

*/s/ Ari J. Jaffess*
Ari J. Jaffess